IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 3:19-cr-00277-JFA |
| | ) | 3:26-cr-00550-JFA |
| v. | ) | |
| | ) | |
| HERB KIMBLE | ) | |

**GOVERNMENT'S AMENDED SENTENCING MEMORANDUM**

The United States of America respectfully submits this amended memorandum for the Court's consideration[1] in connection with the sentencing of Herb Kimble (the "Defendant" or "Kimble"), presently scheduled for October 26, 2026. For the reasons stated below, the Court should adopt the findings of the United States Probation Office ("Probation") in the Presentence Investigation Report (the "PSR"). The United States respectfully requests that the Court impose a prison sentence of 240 months, which will provide punishment for the instant offenses that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### a. The Overall Scheme

In 2019, the Federal Bureau of Investigation (FBI) and the U.S. Department of Health and Human Services Office of the Inspector General (HHS-OIG) began investigating allegations of healthcare fraud in the Durable Medical Equipment (DME) and telemedicine industries. The gravamen of the scheme involved the payment of illegal kickbacks by DME companies in exchange for the referral of Medicare beneficiary information by medical professionals working

[1] The Government submits this amended sentencing memorandum in light of the Defendant's breach of his plea agreement, flight, and subsequent Indictment charging three counts of Failure to Appear following the Government initial submission of its sentencing memorandum on October 14, 2022. (Doc. No. 63).

with fraudulent telemedicine companies for back, shoulder, wrist, and knee braces that were medically unnecessary, not provided as represented, and not eligible for reimbursement.

The scheme generally worked as follows: Kimble's call centers would recruit beneficiaries using commercials and mailers targeting Medicare beneficiaries with promises of low-to-no-cost braces and by purchasing Medicare beneficiaries' contact information (referred to as 'leads'). Most of the recruited beneficiaries were elderly and some had cognition issues such as Alzheimer's and dementia. Kimble referred to his call center employees as "fronters" and "chasers." Once a beneficiary called the number provided on the advertisement or received a call, a telemarketer working at Kimble's call center in the Philippines would obtain the beneficiary's sensitive personal identifying and health information. The telemarketer then typically pressured the beneficiary to accept multiple braces and then transfer the beneficiary's information to a purported telemedicine company.

The purported telemedicine company would then arrange for a doctor or nurse practitioner to sign prescriptions for DME which, once signed, would be transferred to Kimble's customer. Kimble paid the purported telemedicine companies a kickback, expecting a high conversion rate, i.e, a high percentage of the prescriptions to be signed. The doctors and nurse practitioners were paid a kickback per "consult" to sign the prescriptions. In reality, as Kimble knew, most of these medical professionals were not having consults with beneficiaries, but just signing prescriptions. Even those who had contact with the beneficiaries could not examine or see the beneficiary and only briefly spoke to them over the phone. The braces the patient could receive were pre-selected by Kimble's operation and the DME companies:






The goal was to maximize reimbursement by equipping someone with the "Iron Man Package," which meant prescribing three braces or more to a single beneficiary. The prescribing doctors and nurse practitioners could not prescribe anything other than the products selected by Kimble and the DME companies, for example, physical therapy, surgery, or medication. They had no prior relationship with the beneficiary, could not run diagnostic tests on the beneficiary, only had the information gathered by the call center, and did not follow up with the beneficiaries.

The entire packet, called a 'completed doctor's order,' would then be sold to a DME company (or to purported marketers who resold the orders to DME companies). It was a template designed to pass Medicare scrutiny and allow medical professionals to robo-sign the orders en masse. A drop-ship company that contracted with manufacturers would then send the brace to the beneficiary, which was mass-produced and not fit to the beneficiary. The DME company in turn billed Medicare for the braces, based on the completed doctor's order the DME company paid for with illegal kickbacks and bribes. The fee per completed doctor's order was disguised in sham contracts and on sham invoices as payment for "marketing" and "back-office processing" instead of payment for a beneficiary's information and the doctor's order. These deceptive invoices and

contracts were designed and utilized to conceal the illegal nature of the kickback payments from the DME companies to Kimble's call centers from Medicare and law enforcement.

Put simply, the scheme involved Kimble selling patients and signed prescriptions to DME companies. The purchased patients and doctors' orders were used by Kimble for his DME companies and by his many customers to fraudulently bill Medicare for braces. The investigation revealed that Kimble was a primary architect of the scheme. From his home in the Philippines, he would procure patients through his marketing companies and off-shore telemarketing call centers, procure signed prescriptions by paying kickbacks to purported telemedicine companies, and sell those signed prescriptions and patients to the various DME companies – whose true owners were oftentimes hidden through various nominee owners, including for his own DME companies. The use of straw owners was another step to conceal the scheme, obscuring from Medicare the shared ownership of different companies so that the DME companies could continue to bill Medicare, even after one company had their billing practices were scrutinized or audited by regulators.

**b. Kimble's Cooperation**

In approximately August 2017, the Government approached Andrew Chmiel, a beneficial DME company owner (rather than the person falsely reflected on enrollment documents), to discuss his potential role in the scheme. At the time, this was the only DME company the Government was aware of. Chmiel informed his business partner, Kimble, that federal authorities were investigating the DME company. Just after Christmas 2017, as the Government was building its case against the DME company and Chmiel, Kimble approached the Government through counsel. At this time, Kimble had already fled from the United States to the Philippines, where at the time extradition was unlikely and potentially impossible.

The Government and Kimble ultimately entered into a proffer agreement on June 13, 2018. Pursuant to the proffer agreement, Kimble provided a list of his customers and information about his activities. The meeting was held in London based on Kimble's concerns about criminal culpability and arrest if he returned to the United States. Since then pursuant to a plea agreement, Kimble has provided detailed information about the scheme, prepared to testify at trials, testified in one trial, and surreptitiously recorded individuals during covert meetings at the Government's direction, including owners of DME companies, purported telemedicine companies, and one international money launderer. Kimble also provided a forensic image of his companies' servers which contained information including recorded telephone calls, screenshots of his online portal, and prescriptions amounting to more than 70 terabytes of data relevant to numerous investigations across the United States. Kimble's information and efforts significantly contributed to Operation Brace Yourself, one of the largest healthcare fraud prosecutions of its kind.

Because of the difficulty in extraditing him from the Philippines, and in recognition of his then ongoing cooperation, Kimble was offered a plea to one count of Conspiracy Against the United States, with multiple objects and a statutory maximum sentence of five years. The parties agreed that there would be no additional motion under Section 5K1.1 or Rule 35 because recognition of prior and any future cooperation was incorporated into the charging decision.

**c. Procedural History**

On April 4, 2019, Kimble pleaded guilty pursuant to a plea agreement to one count of Conspiracy Against the United States, in violation of Title 18 United States Code Section 371, for his role in the above-described scheme. (ECF No. 3). The conspiracy included many objects: to (1) defraud the United States in its administration of Medicare, (2) make false claims, (3) commit

mail fraud, (4) to commit wire fraud, (5) commit health care fraud, and (6) to offer and pay kickbacks and bribes. (*Id.*). As part of his plea pursuant to Rule 11(c)(1)(C), Kimble promised to pay $40 million in restitution at the time of sentencing,[2] and the Government agreed to recommend a probationary sentence. (ECF No. 11). The Court accepted Kimble's guilty plea but deferred for sentencing its decision on whether to accept the probation aspect of his plea. Kimble's sentencing was continued to permit him to complete his cooperation. Over five years later, on August 27, 2024, the Court set a status conference in anticipation of sentencing and required Kimble's presence. (ECF No. 94). Kimble failed to appear for the status conference, and the Court issued a bench warrant. (ECF No. 95). Sentencing was set for September 19, 2024. Kimble again failed to appear. (ECF No. 101). Sentencing was set for November 7, 2024, and Kimble, for a third time, failed to appear. (ECF No. 106). Based on his failures to appear, Kimble was found in breach of his plea agreement. (*Id.*).

On June 11, 2026, Kimble was apprehended in the Philippines and deported back to the United States. On June 16, 2026, the Grand Jury returned an Indictment charging Kimble with three counts of Failure to Appear, in violation of Title 18 United States Code Section 3146. (Case No. 3:26-cr-550, ECF No. 1). Kimble pleaded guilty to the Indictment on August 11, 2026 (Case No. 3:26-cr-550, ECF No. 27) pursuant to a new plea agreement with the Government. (Case No. 3:26-cr-550, ECF No. 25). In the agreement, Kimble agreed to plead guilty to the 2019 Information in addition to the Indictment in Case Number 3:26-cr-550. Kimble also agreed to pay over $199 million in restitution and to serve a sentence between 180- and 240-months imprisonment. (*Id.*)

[2] No total amount of restitution was agreed to in the original plea agreement.

## II. KIMBLE WAS THE ARCHITECT OF ONE OF THE LARGEST INTERNATIONAL HEALTH CARE FRAUD SCHEMES AND SHOULD SERVE A SIGNIFICANT PRISON SENTENCE

The Court must consider the factors under Title 18, United States Code, Section 3553(a) to fashion an appropriate sentence, this Memorandum addresses the relevant factor in turn.

### a. The Nature and Circumstance of the Offense Indicate that a Significant Prison Sentence is Warranted.

Kimble served as the architect and the essential connector for the co-conspirators in this massive health care fraud and kickback scheme. The scheme was designed to take advantage of elderly and disabled individuals to steal hundreds of millions of dollars from Medicare, the taxpayer-funded program that cares for these vulnerable Americans. He "chased" the Medicare beneficiaries and got their sensitive personal identifying and health information needed to bill Medicare, even starring in one of his own commercials. Then, his operation sent the information and paid illegal kickbacks to the purported telemedicine companies to get the doctor or nurse practitioner's signature on the prescriptions for the braces, which again was necessary to bill Medicare. Then, Kimble arranged for the prescriptions to be sent to DME companies, who paid Kimble an illegal kickback for the prescriptions. These prescriptions purchased from Kimble allowed the DME companies to bill Medicare for the medically unnecessary and kickback-tainted braces. Without Kimble, the patient information would not have been collected, it would not have been sent to the purported telemedicine companies, no prescription could have been written, and no DME company could have billed for the medically unnecessary braces. Additionally, not only was Kimble the engine in this operation, he also was the fuel. He orchestrated the scheme

and connected the players while scaling the operation to a level never seen before, resulting in over $400 million in intended loss to Medicare by mid-2018.

Further, Kimble inserted himself into other areas of the scheme by serving as the disguised and true owner in various DME companies and by purchasing and operating Comfortland, a DME manufacturer and drop-shipping company who his co-conspirators bought braces from and used to ship the medically unnecessary braces. This allowed Kimble to unlawfully enrich himself and to have a unique visibility into every part of the scheme. Kimble's personal gain from the scheme is $195,647,200.

The defense alleges that the Government has inflated Kimble's personal gain from the scheme. That is not true. Kimble's conservative gross profit in just two years was over $195 million. This figure represents the kickbacks received by Kimble and is calculated by multiplying the number of prescriptions found on Kimble's servers that directly matched the Medicare Part B claims data by $280, the kickback amount charged by Kimble to the DME companies per prescription. This number is conservative in that it (1) does not account for the illegal proceeds he received from his hidden ownership in DME companies; (2) does not include his profits from Comfortland, his manufacturing and drop-shipping company; (3) does not include claims submitted during his cooperation; (4) does not include prescriptions billed to Medicare Part C or other insurers; (5) does not include prescriptions that were purchased but not ultimately billed by the DME companies; (6) does not include prescriptions billed to Medicare Part B, where Kimble's internal data did not match the billing records; and (7) does not account for orders for which Kimble charged more than $280.

The original plea agreement included an agreed upon restitution payment at sentencing of $40 million. The $40 million figure represented an estimate of how much money Kimble was paid during the scheme while working with the Government. That $40 million was never repaid, as required, and instead, was spent by Kimble for personal purposes. Kimble made over $195 million in selling prescriptions for medically unnecessary braces and more than an additional $40 million while cooperating with the Government, for a total of over $235 million. Kimble has repaid $9 million and lost his $5 million bond because of his own actions. As such, Kimble has not voluntarily paid $14 million in restitution, as he claims. Kimble's repayment of $9 million accounts for less than 0.38% of his ill-gotten gains and should not be considered as a basis for a downward variance.

**b. A Significant Sentence is Required to Reflect the Seriousness of Kimble's Offense and Afford Adequate Deterrence.**

**i. Specific Deterrence**

Kimble first attempts to justify a downward variance by citing his original decision to leave the Philippines and come to the United States at the start of this case, asserting that he could have remained in the Philippines, not cooperated, and would have been untouchable. Instead, this fact underscores the need for specific deterrence. It makes clear that when Kimble fled to the Philippines prior to sentencing, he thought it was unlikely he would be returned to the United States to face the consequences of his actions.

As Kimble concedes, this is not the first time he fled to the Philippines. Kimble first fled when he learned of the investigation and used that as leverage to negotiate his original plea. Kimble knew about the Government's inability to extradite him throughout this case, indicating

he made the conscious decision to relocate to another country where he knew extradition was unlikely and remain there rather than face sentencing. When Kimble ultimately failed to appear for his three noticed court hearings, he showed this Court that he did not intend to take accountability. Instead, he spent two years as a fugitive, a fact he was well aware of, spending his ill-gotten gains in the Philippines, where he believed he was outside the reach of this Court's jurisdiction and law enforcement. Had it not been for the Philippine authorities' deportation action following Kimble's inclusion on the FBI's Most Wanted Fraudsters list, he likely would still be at large, spending the millions he retained from the scheme.

In sum, Kimble was entrusted to pay back the illegal proceeds of his scheme while working with the Government and was further trusted by the Court to return to the United States for his scheduled court dates. Instead, Kimble blatantly disregarded the Court's authority. Kimble was promised an extraordinary benefit for his cooperation. Bafflingly, he breached that plea, fled, and remained at large for nearly two years. There is no one to blame for these changes in circumstances but Kimble. A downward variance would send a damaging message to those who flee to evade justice that you can run, hide, get caught, and still receive a downward variance.

**ii. <u>General Deterrence</u>**

Kimble orchestrated one of the largest health care frauds in our nation's history. A significant sentence is required to reflect the seriousness of these crimes. Health care fraud is on the rise nationally. The United States Sentencing Commission has reported that the prosecution of health care fraud offenses have increased 19.7% since fiscal year 2020. See USSG, Health Care Fraud Quick Facts, available at: *https://www.ussc.gov/research/quick-facts/health-care-fraud*. Sophisticated frauds like Kimble's are difficult to detect and require significant time and

resources to prosecute. Without lengthy prison sentences to deter these fraud schemes, the public government health care programs will be overwhelmed by fraud, as demonstrated by Kimble's $400 million looting of Medicare.

Courts across the country have noted that general deterrence is a particularly important consideration in sentencing white collar criminals. The Eleventh Circuit has noted that, "[b]ecause economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (*quoting* Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Moreover, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id.* Other circuits have similarly noted that white collar crimes are prime areas for deterrence due to the cool, rational thought process of economic crimes. *See*, *e.g.*, *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("We previously have endorsed the idea that white-collar criminals act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity. They are, therefore, prime candidates for general deterrence.") (citations and internal quotations marks omitted); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citations and internal quotation marks omitted); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) ("Restitution is desirable but so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white- and blue-collar offenses,

and limits on the ability of those with money or earning potential to buy their way out of jail.").

Here, Kimble's years-old scheme had a national and international reach. It used hundreds of thousands of elderly and disabled Americans and the programs designed to protect them for personal gain. It was carefully planned and complex, designed to use sham contracts and invoices, straw owners, and templated doctors' orders to avoid detection. Kimble was involved in the planning and each aspect of its operation.

**c. The Need to Avoid Unwarranted Sentencing Disparities among Defendants Who Have been Found Guilty of Similar Conduct.**

A term of imprisonment of 240 months is commensurate to other sentences for similarly-situated actors in the scheme. This month, the owner and CEO of DMERx, the software platform used to send beneficiary information from Kimble's call centers and marketing companies to the purported telemedicine companies and then used to send the prescriptions to the DME companies, were convicted in the Southern District of Florida in case number 1:23-cr-20271. Following separate trials, Defendants Gary Cox and Brett Blackman each were convicted of one count of Conspiracy to Commit Health Care Fraud and Wire Fraud, four counts of Health Care Fraud, one count of Conspiracy to Pay and Receive Health Care Kickbacks, and one count of Conspiracy to Defraud the United States and to Make False Statements in Connection with a Federal Health Care Program. Cox, who is elderly and in ill health, was sentenced to 180 months imprisonment and was ordered to pay over $452 million in restitution to Medicare. Blackman received a 228-month prison sentence and is pending a restitution hearing in early 2027.

Additionally, DME owners who owned only one or two of the dozens of DME companies involved in telemedicine-brace fraud have received significant sentences. Leah and Michael

Hagen, spouses and DME owners who worked directly with Kimble, received 121-month sentences following a trial and were ordered to pay over $27 million in restitution to Medicare in the Northern District of Texas in case number 3:19-cr-00146. Leah and Michael Hagen were convicted of one count of Conspiracy to Defraud the United States and to Pay and Receive Kickbacks and two counts of Conspiracy to Commit Money Laundering. Their loss amount was derived from their ownership in just two DME companies and a fraction of Kimble's. Kimble testified against the Hagens.

As another example, Elizabeth Hernandez, a nurse practitioner who worked for multiple purported telemedicine companies involved in this type of scheme, was sentenced following trial to 240 months imprisonment and ordered to pay over $111 million in restitution in the Southern District of Florida in case number 1:22-cr-20152. Hernandez was convicted of one count of Conspiracy to Commit Health Care Fraud and Wire Fraud and four counts of Health Care Fraud. She personally profited only a fraction of what Kimble profited as she was paid less than $50 per order she signed.

Joel French, like Kimble but on a smaller scale, ran a call center and was a straw owner of DME companies. He went to trial in case number 8:24-cr-156 in the Middle District of Florida and was found guilty of one count of Conspiracy to Offer and Pay Health Care Kickbacks and Solicit and Receive Health Care Kickbacks, one count of Conspiracy to Commit Health Care Fraud and Wire Fraud, and one count of Conspiracy to Commit Money Laundering. His intended loss amount was calculated to be approximately $197 million. French was sentenced to 196 months imprisonment.

Further, Mark Loftis was the owner of single DME company that billed approximately

$30 million to Medicare and was paid approximately $8 million. He was charged in Middle District of Florida and was convicted of a single count of Conspiracy to Commit Health Care Fraud and Wire Fraud in case number 6:25-cr-350 and was sentenced to 168 months imprisonment. Loftis only profited approximately $500,000 from the scheme and was not a hidden owner of his DME company.

Lino Gutierrez received a 210-month sentence of imprisonment after being convicted at trial in the Middle District of Florida in case number 8:23-cr-279 of one count of Conspiracy to Commit Healthcare Fraud and Wire Fraud, 5 counts of Health Care Fraud, Conspiracy to Violate the Federal Anti-Kickback Statute, and 4 counts of Payment of Kickbacks in Connection with a Federal health Care Program. Gutierrez was a hidden and true owner of 2 DME companies. His intended loss was approximately $10.9 million with an actual loss to Medicare of $5.6 million. He was further ordered to pay under $800,000 in forfeiture.

Kimble was not just the owner of a software platform used by the co-conspirators, or an owner of two DME companies, or one of hundreds of medical professionals involved in this scheme. He was the architect, the engine, and the fuel. Kimble *was* the scheme. A term of imprisonment of 240 months sufficiently punishes Kimble for his leading role in these crimes.

Even if this Court were to use Kimble's suggested $8 million loss amount, the guidelines would still support a sentence of 240 months. Under the Sentencing Guidelines, if the loss amount were $8 million and not $400 million, Kimble's offense level, with all other applied enhancements, would be a level 37, putting him in a range of 210-262 months. The $400 million loss amount is, of course, a large contributing factor to Kimble's guideline range. However, the enhancements for his role in the scheme, which reflect central attributes and the way in which he

carried out the scheme, are ultimately what drive a sentence of 240 months. He was undoubtedly a leader and organizer. He ran this sophisticated scheme from abroad. He used telemarketing via the telemarketing call centers he ran. He specifically and intentionally targeted Medicare, a federal health care program. He obstructed justice when he fled. Even a drastic reduction in loss amount puts 240 months squarely within the guidelines range. Accordingly, a sentence of 240 months sufficiently punishes Kimble and avoids unwarranted sentence disparities between him and his co-conspirators, as well as other similarly situated defendants within this scheme.

## III. **CONCLUSION**

For these reasons, the Government respectfully requests that the Court sentence Kimble to a term of imprisonment of 240 months, the statutory maximum for his crimes.

Dated: October 22, 2026.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: s/ *Samantha Usher*
Samantha Usher
Winston D. Holliday, Jr.
Assistant United States Attorneys
United States Attorney's Office
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone (803) 929-3000
samantha.usher2@usdoj.gov